UNITED STATES of America

v.

Pedro Manuel ARRELUCEA–ZAMU-DIO, a/k/a Pedro Arrelucea, Pedro Manuel Arrelucea–Zamudio, Appellant.

No. 08–4397.

United States Court of Appeals, Third Circuit.

Argued on July 9, 2009.

Opinion Filed Sept. 14, 2009.

Maggie F. Moy, Esquire (Argued), Office of Federal Public Defender, Camden, NJ, for Appellant.

Ralph J. Marra, Jr., Acting United States Attorney, George S. Leone, Chief, Appeals Division, Jennifer H. Chin (Argued), Assistant U.S. Attorney, Caroline A. Sadlowski, Esquire, Office of United States Attorney, Newark, NJ, for Appellee.

Before: SLOVITER, AMBRO, and JORDAN, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

In certain federal judicial districts, "fast-track" programs allow qualifying immigrant defendants to plead guilty while waiving, among other things, their appellate and post-conviction rights. In turn, the Government agrees to request a departure from the relevant Sentencing Guidelines range. None of the districts in the Third Circuit is a fast-track district.

Pedro Manuel Arrelucea–Zamudio ("Arrelucea") pled guilty to illegal reentry into the United States, in violation of 8 U.S.C. § 1326(a) and (b)(2). The District Court sentenced him to 48 months' imprisonment. Arrelucea appeals his sentence, challenging, among other things, the Court's rejection of his argument for a downward variance based on the disparity in sentencing among immigration defendants in fast-track districts and non-fast-track districts.[1]

The Sentencing Guidelines are advisory, and the Supreme Court's decision in *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), has rekindled discussion regarding fast-track districts and sentencing. The question before us is whether, post-*Kimbrough*, it is an abuse of a sentencing judge's discretion to consider varying from the Sentencing Guidelines in a non-fast-track jurisdiction based on the disparity created by lower immigration sentences in fast-track jurisdictions. Prior to *Kimbrough* we addressed this issue in *United States v. Vargas*, 477 F.3d 94 (3d Cir.2007). We take this opportunity to clarify *Vargas* and expand on the issue in light of the Supreme Court's recent guidance. We conclude that, under the logic of *Kimbrough*, it is within a sentencing judge's discretion to consider a variance from the Guidelines on the basis of a fast-track disparity.

## I. Background

Arrelucea was born in Peru, but moved to Mexico with his wife and daughter in the late 1960s. He illegally entered the United States in 1979, eventually living and working in New Jersey, where he applied for U.S. residency. In 1991 he was convicted under New Jersey law of possession with intent to distribute a controlled substance, and was sentenced to 12 years' imprisonment. Approximately four years later, however, he was deported to Peru.

1. The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Arrelucea illegally reentered the United States in December 2000. He returned to New Jersey and secured employment using his previously issued Social Security number. According to Arrelucea, he supported his ex-wife and two children living in the United States, and sent money to his mother and sisters living in Peru. In June 2006, at 60 years old, Arrelucea was arrested again in New Jersey for possession with intent to distribute cocaine. This time, he was sentenced to five years in state prison. In September 2007, after serving approximately 15 months of his sentence, he was transferred to the custody of federal Immigration and Customs Enforcement.

A federal grand jury indicted Arrelucea on one count of illegal reentry, to which he pled guilty in May 2008. At his plea colloquy, Arrelucea admitted that he had been deported previously and had illegally reentered the United States. However, he did not make any admissions regarding his prior criminal history.[2] The Government offered evidence of Arrelucea's 1991 and 2006 New Jersey state felony convictions for possession with intent to distribute.

At Arrelucea's sentencing, he raised a facial constitutional challenge to the aggravated felony sentencing enhancement of the illegal reentry statute—that his prior convictions needed to be proven beyond a reasonable doubt before the District Court could enhance the normal sentencing-range calculation. The Court rejected this argument and allowed certified copies of Arrelucea's prior convictions to establish his eligibility for an enhancement.

Arrelucea also argued for a downward variance under 18 U.S.C. § 3553(a)(6) based on the disparity in sentence between fast-track and non-fast-track immigration districts. In his sentencing memorandum, he calculated his Guidelines range in a fast-track district at 30 to 37 months' imprisonment, rather than the higher 46 to 57 months' imprisonment under his non-fast-track calculation, and advocated for a sentence of not more than 36 months. The District Court rejected this argument, concluding that our decision in *Vargas* precluded consideration of a variance on this basis as a matter of law, and that the Supreme Court's decision in *Kimbrough* did not alter this analysis.

Finally, Arrelucea argued more generally that, based on his circumstances, the § 3553(a) factors supported varying down to impose a sentence below the Guidelines range. For example, he stated that he only illegally reentered the country once to provide economic stability for his family and care for his daughters living in the United States, he worked and paid taxes while living in the United States, he suffers from ailments related to his age, he expressed remorse for his actions, and, after removal, he will no longer have the need to return to the United States because his children are grown and he has family in Peru. The Government opposed any downward variance.

The Court declined to vary from the Guidelines range, noting that Arrelucea was deported initially after committing a serious drug offense and that when he returned he committed another serious drug offense. Accordingly, it imposed a sentence of 48 months' imprisonment.

## II. Standard of Review

 We review a sentence for reasonableness under the deferential abuse-of-discretion standard. *Gall v. United*

___

**2.** Through the advice of counsel, Arrelucea did not admit to his prior convictions to preserve a constitutional challenge to the felony and aggravated felony sentence enhancement provision of the illegal reentry statute, 8 U.S.C. § 1326(b)(2).

*States,* 552 U.S. 38, 128 S.Ct. 586, 594, 169 L.Ed.2d 445 (2007). Our review of procedural errors in sentencing includes a district court's improper calculation of the Guidelines, "treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Wise,* 515 F.3d 207, 217 (3d Cir.2008). In reviewing for reasonableness, alleged factual errors are subject to a "clearly erroneous" standard, but "purely legal" errors, such as a misinterpretation of the Guidelines or the governing caselaw, are reviewed *de novo. Id.*

### III. Discussion

#### A. Fast–Track Programs

We begin with some historical background on fast-track programs, which are also known as early disposition programs. They sprang up in federal judicial districts along the Mexican border, starting in Southern California, in the mid–1990s. Local U.S. Attorneys instituted these programs as an administrative mechanism to address the increase in their immigration caseload, such as the rise in prosecution of illegal reentry offenses, and to create a process for faster and more efficient disposition of these cases. U.S. Sentencing Comm'n, Report to Congress, *Downward Departures from the Federal Sentencing Guidelines,* at 65 (Oct.2003) (hereinafter "Sentencing Commission Report").

In 2003, Congress took note of this growing pattern. Through the PROTECT Act,[3] it sanctioned these programs under certain circumstances. PROTECT Act, § 401(m)(2)(B), 117 Stat. at 675; *see also* Sentencing Commission Report, at 56, 62. The Act, passed pre-*Booker,* was part of a

more general effort by Congress to deal with a perceived increase in the rate of departures from the Sentencing Guidelines. PROTECT Act, § 401(m)(2)(A), 117 Stat. at 675; *see also* Sentencing Commission Report, at 56 (explaining that Congress amended 18 U.S.C. § 3553(c) (statement of reasons for imposing a sentence) and § 3742 (review of a sentence) to facilitate meaningful appellate review of sentences, particularly departure decisions).

Specifically concerning fast-track districts, the Act directed the Sentencing Commission to promulgate "a policy statement authorizing downward departures of no more than 4 levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney." PROTECT Act, § 401(m)(2)(B), 117 Stat. at 675. Shortly thereafter, in October 2003, the Sentencing Commission created Guideline § 5K3.1, which provides that, "upon motion of the Government, the court may depart downward not more than 4 levels pursuant to an early disposition program authorized by the [Attorney General] and the United States Attorney for the district in which the court resides." This language tracks that of the PROTECT Act essentially verbatim.

In response to the PROTECT Act, the Attorney General issued a memorandum to all federal prosecutors discussing Department of Justice policies relating to authorization and administration of fast-track programs. Memorandum from John Ashcroft, Att'y Gen., Dep't of Justice, to U.S. Attorneys (Sept. 22, 2003), *reprinted in* 16 Fed. Sent. R. 134 (Dec.2003) ("Attorney General Memorandum"). As part of a fast-track plea agreement, a qualifying defendant, at a minimum, must agree to the

---

**3.** Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act

(PROTECT), Pub.L. No. 108–21, 117 Stat. 650, 675 (2003).

factual basis that accurately reflects his offense conduct, agree not to file any Federal Rule of Criminal Procedure 12(b)(3) motions *(e.g.,* alleging a defect in the indictment or to suppress evidence), and waive the right to appeal and right to file for a writ of habeas corpus under 28 U.S.C. § 2255 (except for ineffective assistance of counsel). In return, the Government may commit to recommend a Guidelines departure of not more than 4 levels, or may implement a "charge bargaining" fast-track program where the parties' agreement adjusts the initial Guidelines calculation downward by reducing the charge. *See* Attorney General Memorandum. As of February 2008, the Attorney General had authorized fast-track programs in 20 districts, though only 16 of those have illegal reentry programs (thus, fast-track programs exist in approximately 17% of the 94 federal judicial districts). *See* Memorandum of Dep't of Justice, *Reauthorization of Early Disposition Programs* (Feb. 1, 2008).

## B. Sentencing Discretion

 Arrelucea's fast-track argument concerns the extent of the District Court's discretion at sentencing. The Sentencing Guidelines are now advisory only. *United States v. Booker,* 543 U.S. 220, 246, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In *United States v. Gunter,* 462 F.3d 237 (3d Cir.2006) (and confirmed by the Supreme Court in *Kimbrough,* 128 S.Ct. at 574–75, and *Gall,* 128 S.Ct. at 596–97 & n. 6), we provided sentencing judges with a three-step process for determining the appropriate sentence to impose on a defendant:

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker.*

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.[4]

*Gunter,* 462 F.3d at 247 (alterations in original omitted) (internal quotations and citations omitted) (holding a sentencing judge can consider the crack/powder cocaine differential under step 3 because those Guidelines are advisory post-*Booker*). The statutory § 3553(a) sentencing factors that must be given "meaningful consideration" in step 3 include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—(A) the

---

4. "As an aside, our Court has previously stated that we distinguish between traditional departures based on a specific Guidelines provision [step 2] and sentencing 'variances' from the Guidelines that are based on *Booker* and the § 3553(a) factors [step 3]. *United States v. Vampire Nation,* 451 F.3d 189, 195 n. 2 (3d Cir.2006)." *Gunter,* 462 F.3d at 247.

applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—(i) issued by the Sentencing Commission ..., subject to any amendments made to such guidelines by act of Congress ...; and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement—(A) issued by the Sentencing Commission ..., subject to any amendments made to such policy statement by act of Congress ...; and (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see Wise,* 515 F.3d at 216 (explaining that the applicable § 3553(a) factors must be given "meaningful consideration" by sentencing judges). The Guidelines are only one of the factors for a district court to weigh in determining the appropriate sentence to impose, and in doing so the court "may not presume that the Guidelines range is reasonable." *Gall,* 128 S.Ct. at 596–97.

We have spoken previously on the fast-track issue in *Vargas,* 477 F.3d 94, a pre-*Kimbrough* case. At sentencing for Vargas's illegal reentry offense, he requested a variance at *Gunter* step 3, arguing that a sentence within the Guidelines range "would create an unwarranted disparity in violation of 18 U.S.C. § 3553(a)(6)." *Id.* at 97 n. 6. In rejecting this argument, we followed the "Second and Fourth through Eleventh Circuits [to] hold that a district court's refusal to adjust a sentence to compensate for the absence of a fast-track program does not make a sentence unrea-

sonable." *Id.* at 99. Focusing specifically on subsection (a)(6), we reasoned that "any sentencing disparity authorized through an act of Congress cannot be considered 'unwarranted.'" *Id.* at 100. Prior to *Kimbrough,* nearly every Court of Appeals to consider the issue had "uniformly rejected arguments by non-fast-track defendants that any disparity created by these programs is unwarranted" under this subsection. *Id.* at 98–99 (citing cases from other Courts of Appeals). Consequently, we concluded that Vargas's within-Guidelines sentence was reasonable.

The Supreme Court added another landmark to the sentencing landscape when it addressed the crack/powder cocaine Sentencing Guidelines disparity in *Kimbrough.* The Anti–Drug Abuse Act of 1986 (Pub.L. No. 99–570, 100 Stat. 3207) "adopted a '100–to–1 ratio' that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine." *Kimbrough,* 128 S.Ct. at 567. The Sentencing Commission did not use an empirical approach in formulating the crack/powder Guidelines, as is part of its institutional role, but instead employed the congressional ratio scheme. *Id.* at 567. The Commission later criticized that ratio, concluding that the resulting disparity between crack and cocaine sentences "fails to meet the sentencing objectives." *Id.* at 568–69 (describing the Commission's criticism and Congress's rejection of Commission-sponsored amendments to the Guidelines that would have replaced the 100–to–1 ratio with, at various times, a 20–to–1, 5–to–1, or even 1–to–1 ratio, and the Commission's unilateral change that reduced the crack base offense level by two levels).

Based on this background, *Kimbrough* held that a district court may deviate from the Guidelines range for crack cocaine offenses, "even in a mine-run case," if it concludes that the disparity between

ranges for crack and powder cocaine results in a sentence "greater than necessary" to achieve the sentencing objectives of § 3553(a). *Id.* at 564, 575. Under *Booker,* the cocaine Guidelines, like all other Guidelines, are advisory only, and courts err in concluding that the crack/powder disparity reflected in the Guidelines is effectively mandatory. *Id.* at 564, 575; *see also Gall,* 128 S.Ct. at 597 (holding it is procedural error to treat the Guidelines as mandatory).

Significantly, the Court rejected the Government's argument that the cocaine sentencing disparity in the Guidelines was binding on district courts because it accorded with a policy mandated by Congress in the 1986 Act. *Kimbrough,* 128 S.Ct. at 570–71, 575. Rather, it found that in the 1986 Act Congress explicitly mandated only statutory maximum and minimum sentences, not the 100–to–1 ratio reflected in the Guidelines for the full range of cocaine quantities. *Id.* at 571–72.

This year, in *Spears v. United States,* — U.S. ——, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009), the Supreme Court reconfirmed and succinctly explained its holding in *Kimbrough.*

> The only fact necessary to justify such a variance is the sentencing court's disagreement with the [G]uidelines—its policy view that the 100–to–1 ratio creates an unwarranted disparity.... That was indeed the point of *Kimbrough:* a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with

them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case.

*Id.* at 842–43 (emphasis in original).

Post-*Kimbrough,* a district court's sentencing discretion in a non-fast-track district remains the same at steps 1 and 2. That is, for a sentence to be procedurally reasonable, a court that disagrees with the sentencing disparity created by fast-track programs cannot alter the calculation of the Guidelines at step 1 to comport with the calculation in a charge-bargaining fast-track district, nor do we understand that it could unilaterally grant a formal departure pursuant to Guideline § 5K3.1 under step 2 without the Government's recommendation.[5] We deal in this case only with a district court's ability to consider a variance on the basis of a fast-track argument post-*Kimbrough* at step 3 when fashioning an appropriate sentence to meet the § 3553(a) sentencing objectives.

*Vargas*'s holding under step 3—that it is not an abuse of a sentencing judge's discretion to decline to vary on the basis of fast-track disparity—remains viable after *Kimbrough. Vargas,* 477 F.3d at 99. This accords with *Gunter,* where we explained that a district court "is under no obligation to impose a sentence below the applicable Guidelines range solely on the basis of the crack/powder cocaine differential." 462 F.3d at 249. Thus, in reviewing a district court's sentence, we do not conclude that a sentence is per se unreasonable because the judge declined to vary from the Guide-

---

5. Under step 1, a charge-bargaining program alters the initial Guidelines calculation. It is sanctioned by the Attorney General, but not contemplated by Congress in the PROTECT Act or the companion Guidelines section. A prosecutor employing this approach allows a defendant to plead guilty to the less serious charge of improper entry, thus reducing the Guidelines range calculation, sometimes well beyond what would otherwise be a four-level departure at step 2. Under step 2, if a defendant in a fast-track district pleads guilty pursuant to this program, the Government agrees to recommend a downward departure from the Guidelines range based on a formal departure motion, as stated in Guideline § 5K3.1.

lines range based on a defendant's fast-track argument.

■ We must clarify *Vargas* post-*Kimbrough,* however, to the extent that it has been read—as the District Court did here—as prohibiting a sentencing court's discretion to consider a fast-track disparity argument because such a disparity is warranted by Congress under § 3553(a)(6). That interpretation is no longer the view of our Court in light of *Kimbrough*'s analytic reasoning.[6]

■ The fast-track issue should not be confined to subsection (a)(6), which concerns "avoid[ing] unwarranted sentencing disparities." Instead, we hold that a sentencing judge has the discretion to consider a variance under the totality of the § 3553(a) factors (rather than one factor in isolation) on the basis of a defendant's fast-track argument, and that such a variance would be reasonable in an appropriate case.

We analogize this issue to the crack cocaine question dealt with in *Kimbrough.* In the cocaine Guidelines context, the Supreme Court stated that a sentencing "judge must include the Guidelines range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentenc-

ing." *Kimbrough,* 128 S.Ct. at 564. The Court held that, "[i]n making that determination, the judge may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses," *id.,* and, "[t]o reach an appropriate sentence, ... disparities must be weighed against the other § 3553(a) factors." *Id.* at 574. By logical extension we believe a judge may also consider the disparate treatment of immigration defendants that is created by fast-track programs in determining whether a Guidelines sentence is greater than necessary under the § 3553(a) factors.

### 1. Congressional Policy

Three of our sister Circuit Courts of Appeals—in the Fifth, Ninth, and Eleventh Circuits—have taken another approach in re-evaluating this issue after *Kimbrough,* concluding that it has no effect on fast-track sentencing arguments.[7] *United States v. Gomez–Herrera,* 523 F.3d 554, 559 (5th Cir.2008) ("*Kimbrough,* which concerned a district court's ability to sentence in disagreement with Guideline policy, does not control this case, which concerns a district court's ability to sentence in disagreement with Congressional policy."); *United States v. Gonzalez–Zotelo,* 556 F.3d 736, 741 (9th Cir.2009) (same); *United States v. Vega–Castillo,*

---

**6.** "Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, ... a panel may reevaluate a precedent in light of intervening authority...." *Reich v. D.M. Sabia Co.,* 90 F.3d 854, 858 (3d Cir.1996); *see also Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 276 n. 50 (quoting *Williams v. Ashland Eng'g Co.,* 45 F.3d 588, 592 (1st Cir.1995) ("An existing panel decision may be undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court ...."), *overruled on other grounds by Carpenters Local Union No. 26 v.*

*U.S. Fid. & Guar. Co.,* 215 F.3d 136 (1st Cir.2000)).

**7.** In *Kimbrough,* the Supreme Court noted a similar split among the Courts of Appeals on the crack cocaine disparity question. *See* 128 S.Ct. at 566 n. 4 (indicating that our Court (in *Gunter* ) and the D.C. Circuit Court adopted *Kimbrough*'s approach to discretion allowed sentencing judges to consider the crack/powder cocaine disparity, while the First, Second, Fourth, Fifth, Seventh, Eighth, and Eleventh Circuit Courts adopted the rejected approach that a district court has no discretionary authority to consider that disparity).

540 F.3d 1235, 1237 (11th Cir.2008) (same and refusing to apply *Kimbrough* to fast-track disparity issue because *Kimbrough* dealt with the cocaine Guidelines). These Courts of Appeals focused on congressional policy expressed in the PROTECT Act as the sole factor distinguishing the fast-track issue from the crack cocaine question in *Kimbrough*. Because of this, they essentially concluded that the Guidelines are binding on the fast-track question.

We disagree with this analysis. Focusing on congressional policy here is illusory, as we will explain in more detail, and it does not justify prohibiting a district court's discretion at sentencing.[8] Moreover, we reject as superficial the factual distinction made by the Eleventh Circuit Court in *Vega–Castillo,* 540 F.3d at 1237, that *Kimbrough* dealt with crack/powder cocaine sentencing disparity and not fast-track sentencing disparity. *See United States v. Herrera–Zuniga,* 571 F.3d 568, 585 (6th Cir.2009) (stating in an illegal reentry case that "[w]e thus see no reason to limit the authority recognized in *Kimbrough* and confirmed in *Spears* to the crack-powder cocaine context. . . . [Nor do] we stand alone in that regard." (citing cases from the First, Second, Fifth, Ninth, and Tenth Circuit Courts of Appeals)).

Instead, we are more aligned with the post-*Kimbrough* view of the First Circuit Court expressed in *United States v. Rodriguez.* 527 F.3d 221 (1st Cir.2008) (holding that post-*Kimbrough* a district court can consider fast-track disparity as grounds for a variance); *see also United States v. Stone,* 575 F.3d 83, 89 (1st Cir.2009) ("And our precedent has interpreted *Kimbrough* as supplying this power even where a

guideline provision is a direct reflection of a congressional directive.").

There is no question that the Guidelines are advisory only. The congressional policy argument attempts to carve out an exception to this *Booker* norm by binding a district court's sentencing discretion on the fast-track issue. The crux of the argument is that the PROTECT Act's congressional directive sanctioning fast-track programs in certain judicial districts necessarily authorizes disparate sentencing of immigration defendants between fast-track and non-fast-track districts, so that the disparity is not "unwarranted" under § 3553(a)(6). Thus, a district court cannot vary from the Guidelines range on the basis of a disagreement with the treatment of defendants in non-fast-track districts because it is mandated by Congress. Most courts pre-*Kimbrough* took this position (see, for example, *Vargas,* 477 F.3d at 98–99 (collecting cases)), but it does not have continued vitality post-*Kimbrough*.

In *Kimbrough,* the Supreme Court rejected the Government's argument that the 100–to–1 crack/powder cocaine ratio represented a "specific policy determinatio[n] that Congress has directed sentencing courts to observe," thus making it "an exception to the general freedom that sentencing courts have to apply the [§ 3553(a) ] factors." 128 S.Ct. at 570 (alteration in original) (internal quotations omitted). The Court made clear that, absent an express directive from Congress, it would not read any implicit directive into the Anti–Drug Abuse Act of 1986. *Id.* at 571–72 (explaining that Congress used the 100–to–1 crack/powder ratio to trigger the mandatory minimums and maximums). We think the Supreme Court's rejection of

---

8. Indeed, at oral argument in this case the Government declined to take the Fifth, Ninth, and Eleventh Circuit Courts' approach. It did not argue—correctly, we believe—that

congressional policy concerning fast-track programs prohibited the exercise of a district court's discretion.

the Government's argument in *Kimbrough* crosses over to apply to the implicit congressional directive argument made to support fast-track sentencing disparities.

The PROTECT Act contains no express congressional fast-track directive that would constrain a sentencing judge's discretion to vary from the Guidelines. The First Circuit Court stated in *Rodriguez* that

> by its terms, [the fast-track Guideline, § 5K3.1, which restates the PROTECT Act's congressional directive,] neither forbids nor discourages the use of a particular sentencing rationale, and it says nothing about a district court's discretion to deviate from the [G]uidelines based on fast-track disparity [under the § 3553(a) factors]. The statute simply authorizes the Sentencing Commission to issue a policy statement and, in the wake of *Kimbrough*, such a directive, whether or not suggestive, is not decisive as to what may constitute a permissible ground for a variant sentence.

527 F.3d at 229 (internal quotations and citation omitted).

As embodied in the Guidelines, Congress generally sanctioned district-wide fast-track programs as a matter of prosecutorial discretion and cabined the extent of a formal departure at step 2 pursuant to these programs. The PROTECT Act did not reduce sentences for illegal reentry defendants in any specific districts, nor did it dictate the departure level in fast-track districts for similarly situated defendants. *See United States v. Medrano–Duran*, 386 F.Supp.2d 943, 947 (N.D.Ill.2005) (surveying various departure levels in fast-track districts). Moreover, as with all departure motions, the Act did not bind a sentencing court to accept the Government's motion,

and a court can exercise its discretion to reject the departure.

The Act also did not expressly stop an individual sentencing judge *from granting* variances at step 3 in non-fast-track districts based on the congressionally mandated § 3553(a) factors, nor did it require non-fast-track courts to mete out higher sentences than courts in fast-track jurisdictions. *See Kimbrough*, 128 S.Ct. at 571 (discussing that "Congress has shown that it knows how to direct sentencing practices in express terms"); *Rodriguez*, 527 F.3d at 229 (noting that the PROTECT Act "says nothing about the court's capacity to craft a variant sentence within the maximum and minimum limits"). By contrast, Congress expressly defined that the statutory maximum for illegal reentry is 20 years, and a district court cannot exceed that maximum sentence. *See* 8 U.S.C. § 1326(b) (a prior aggravated felony triggers this maximum penalty).

In sum, a Guideline is not a statute. If Congress does not want district courts to exercise their judicial function to sentence defendants based on the facts and circumstances of each case under the guidance of the § 3553(a) factors, then it has the power to amend the pertinent statute. It has *not done so here.* Indeed, to argue otherwise is an attempt to manipulate the advisory character of the Guidelines.[9] Thus, the attempt to distinguish fast-track programs from the sentencing guidance provided in *Kimbrough*, and constrain a district court's sentencing discretion solely on the basis of a congressional policy argument, is unpersuasive. *See Kimbrough*, 128 S.Ct. at 570–73 (indicating that when Congress exercised its power to bar district courts from using a particular sen-

---

**9.** In effect, this approach seems like an end-run around *Booker's* constitutional analysis

that made the Guidelines advisory in nature.

tencing rationale, it did so by the use of unequivocal terminology).

Paradoxically, the Fifth Circuit Court case, *Gomez–Herrera*, 523 F.3d 554, which relied on the congressional policy rationale to differentiate the fast-track issue from *Kimbrough*, appears to have curtailed a district court's sentencing discretion post-*Kimbrough* more than it had before that decision. The Court at first stated that it

> has never held that a district court may not consider and give effect to defendant's argument for a reduced sentence on th[e] basis [of a fast-track disparity]. Rather our cases have only concluded that a district court is not required to factor in, when sentencing a defendant, the sentencing disparity caused by early disposition programs to prevent a sentence from being unreasonable.

*Gomez–Herrera*, 523 F.3d at 558 n. 1 (internal quotations and citations omitted). Yet it went on to say that post-*Kimbrough* "it would be an abuse of discretion for the district court to deviate from the Guidelines on the basis of sentencing disparity resulting from fast track programs that was intended by Congress.... [This deviation] would result from an erroneous view of the law." *Id.* at 563 n. 4 (citation omitted). In light of *Kimbrough*, this statement strays from the standard set by the Supreme Court. In its sentencing cases post-*Booker*, the Court has been clear that a sentencing judge has discretion to impose a sentence grounded in the § 3553(a) factors regardless whether it varies from the Guidelines range. *See, e.g., Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007); *Gall*, 128 S.Ct. at 597.

Moreover, the existence of charge-bargaining programs in several districts underscores that these alternative district-wide, early-disposition programs operate outside the bounds of not only the Protect Act, but also Guidelines § 5K3.1. *See Medrano–Duran*, 386 F.Supp.2d at 946–47; *see also* Sentencing Commission Report, at 69 (indicating that these programs may be used "to achieve sentencing outcomes below the otherwise applicable [G]uideline[s] range" and the effect of "charge bargaining on achieving the statutory purposes of sentencing" is hard to analyze). The way these programs work is that, rather than recommending a departure via motion at step 2, the Government at the outset reduces the more serious illegal reentry charge to one or two less serious charges—improper entry, or eluding examination and inspection by an alien, in violation of 8 U.S.C. § 1325(a). The qualifying defendant pleads guilty to one or both of these lesser charges, and thus alters the Guidelines range calculation at step 1.

As noted, this type of immigration fast-track protocol can result in a sentence that is lower than what would have been a four-level departure from an illegal reentry offense. *See Medrano–Duran*, 386 F.Supp.2d at 946–47. Charge-bargaining programs are not part of the PROTECT Act, and are only incorporated into the Attorney General's policy memorandum. *See, e.g.,* Attorney General Memorandum (discussing charge-bargaining programs). Though these programs appear to be a permissible extension of prosecutorial discretion, there is nothing to show that defendants in charge-bargaining districts are less culpable than those who have committed the same offense in non-fast-track districts. While charge-bargaining brings even greater disparity to the system by fostering lower sentences for certain immigration offenses, it does not violate the PROTECT Act. Because it is not included in the PROTECT Act (and thus is not swept into the congressional policy argument), as part of a district court's sentenc-

ing function, particularly § 3553(a)(6), the court could take into account such disparate treatment among these immigration defendants.

## 2. Deference to the Guidelines

The Supreme Court explained in *Gall* that the Guidelines range is not presumptively reasonable, but generally acts as the "initial benchmark" in crafting a sentence. *Gall*, 128 S.Ct. at 596–97. A sentencing judge factors in the Guidelines range "to secure nationwide consistency," *id.* at 596, because the Sentencing Commission develops the Guidelines to " 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives' " in the heartland of cases. *Kimbrough*, 128 S.Ct. at 574 (quoting *Rita*, 127 S.Ct. at 2465). In the normal course, the Commission's discrete institutional role is to formulate the Guidelines through a detailed empirical approach by surveying national sentencing practices, pre-Guidelines sentencing practices, judicial decisions, other data, or comments from participants and experts in the field. *See Kimbrough*, 128 S.Ct. at 574 (citing *Rita*, 127 S.Ct. at 2465 (explaining that the Commission "has the capacity the courts lack" to make these empirical determinations)).

However, if the Commission does not act in its characteristic role, then a sentencing judge can give those Guidelines less deference, "even in a mine-run case," because they "fail[ ] properly to reflect § 3553(a) considerations."[10] *Kimbrough*, 128 S.Ct. at 574–75 (quoting *Rita*, 127 S.Ct. at 2465). *Kimbrough* concluded that the Commission did not act in its institutional capacity in the crack cocaine context, and we be-

lieve that it similarly did not do so in the fast-track context.

"The [Sentencing] Commission implemented [Congress's] directive at section 401(m)(2)(B) of the PROTECT Act regarding early disposition programs by adding a new policy statement at [Guidelines § ] 5K3.1," but in doing so it also openly expressed its criticism, "specifically the potential for unwarranted sentencing disparity based on geography." Sentencing Commission Report, at 79. The Commission stated:

> The Department of Justice requested that the Commission implement the directive regarding the early disposition programs in section 401(m) of the PROTECT Act in a similar unfettered manner by merely restating the legislative language. . . . The Commission notes that implementation of the directive in this manner *has the potential to create unwarranted sentencing disparity . . . .* Defendants sentenced in districts without authorized early disposition programs, however, can be expected to receive longer sentences than similarly-situated defendants in districts with such programs. This type of geographical disparity *appears to be at odds with the overall Sentencing Reform Act goal of reducing unwarranted sentencing disparity among similarly-situated defendants.*
>
> . . . .
>
> . . . . [T]he Commission cannot determine the full impact of fast track programs on the departure rate because fast track departures are documented in various ways by the judicial districts that have such programs.

---

**10.** On the other hand, when the Guidelines exemplify the Commission's exercise of its institutional role, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails to properly reflect § 3553(a) considerations' even in a mine-run case." *Kimbrough*, 128 S.Ct. at 575 (quoting *Rita*, 127 S.Ct. at 2465).

*Id.* at 66–67, 79–80 (emphases added). *Cf. Kimbrough,* 128 S.Ct. at 568 (indicating that the Sentencing Commission "immediately used the 100–to–1 ratio to define base offense levels for all crack and powder offenses," but in a Commission report "later determined that the crack/powder sentencing disparity is generally unwarranted" and " 'fails to meet the sentencing objectives set forth by Congress' " in the Sentencing Reform Act). Indeed, it appears that, absent a downward variance, defendants sentenced in non-fast-track districts who would have been eligible for fast-track treatment in fast-track districts receive longer sentences then their fast-track counterparts simply by virtue of the geographic district where they are prosecuted. *Cf. Kimbrough,* 128 S.Ct. at 566 (noting that the "100–to–1 ratio yields sentences for crack offenses three to six times longer than those for powder offenses involving equal amounts of drugs").

Moreover, the implementation of fast-track districts appears to be uneven. *See* U.S. Sentencing Commission, 2007 Sourcebook of Federal Sentencing Statistics, at 183, 216 ("2007 Sourcebook"); *see also United States v. Gramillo–Garcia,* 632 F.Supp.2d 837, 839–41 (N.D.Ill.2009) (stating that, based on statistical information provided by the Government for fiscal year 2003, the Western District of Washington, a fast-track district, has less than one illegal reentry case per prosecutor per year, and in other fast-track districts, such as Oregon, Idaho, Nebraska, and North Dakota, each AUSA on average handles only two or three illegal reentry cases per year). For example, in the District of Nebraska, which is a fast-track district, immigration offenses comprised 11.77% of all sentences, while in the Northern District of Florida, which is a non-fast track district, immigration offenses comprised 20.94% of all sentences. 2007 Sourcebook, at 183, 216; *see also* Stephanos Bibas, *Regulating Local Variations in Federal Sentencing,* 58 Stan. L.Rev. 137, 145–58 (2005) (discussing unjustified sentencing variations based on fast-track programs and noting that some districts that process large numbers of immigration cases employ fast-track programs, while other districts with similar or heavier loads, such as the Southern District of Florida, do not offer these programs); Jane L. McClellan & Jon M. Sands, *Federal Sentencing Guidelines and the Policy Paradox of Early Disposition Programs,* 38 Az. St. L.J. 517, 523 (2006) ("In some districts with a high rate of immigration cases, such as the District of Nevada, ... the New York districts, [certain] Florida districts, and certain divisions in the Southern District of Texas, there are still no fast-track plea offers.").

These statistics lead us to question whether all approved fast-track districts actually have overwhelming immigration caseloads, which is what Congress appears to have accepted as a given in enacting the PROTECT Act's sanctioning of such programs. The Sentencing Commission has also observed that reliable data documenting the effect of these programs is difficult to ascertain. *See, e.g.,* Sentencing Commission Report, at 62–70. Consequently, it does not appear to be clear to the Commission (based on its limited statistical analysis), nor is it evident to us, why some districts have fast-track programs while others do not.[11]

11. Because of the uneven implementation of fast-track districts and policies within such districts, such a patchwork could result in similarly culpable defendants receiving vastly different sentences based fortuitously on the district in which they were arrested. A 2006 article gives a series of examples to demonstrate the disparities that can result from these programs. *See* McClellan & Sands, 38 Az. St. L.J. at 524–25. One such hypothetical

Like the crack/powder cocaine ratio in *Kimbrough*, the fast-track departure scheme "do[es] not exemplify the Commission's exercise of its characteristic institutional role" in developing the Guidelines. *Kimbrough*, 128 S.Ct. at 575 (explaining the same for the crack cocaine Guidelines). In authorizing a departure for defendants in fast-track districts only, the Commission did not systematically evaluate the issue before implementing the fast-track Guideline. *Cf. id.* at 567, 575 (explaining that, in formulating the crack cocaine Guidelines, the "Commission did not use this empirical approach.... Instead, it employed the 1986 [Anti–Drug Abuse] Act's weight-driven scheme" to set 100–to–1 ratio "offense levels for crack and powder cocaine ... in line with the 1986 Act"). Rather, it quickly adopted the congressional language. *Cf. id.* Accordingly, as the First Circuit Court explained in *Rodriguez*, the "[G]uidelines and policy statements embodying these judgments deserve less deference than the sentencing guidelines normally attract," and, as a result, may produce a sentence that is greater than necessary to provide just punishment in a particular case under the § 3553(a) factors. 527 F.3d at 227 (internal quotations and citations omitted); *see also Kimbrough*, 128 S.Ct. at 574–75 (explaining that the Guidelines are not binding and in the crack cocaine context a district court may vary "even in a mine-run case").

■ In sentencing a defendant for illegal reentry in a non-fast-track district at step 3, a sentencing court "must make an individualized assessment based on the facts presented," and "judge their import under § 3553(a)." *Gall*, 128 S.Ct. at 597. We entrust this sentencing discretion to the district court because it is most familiar with the details of the offender and the offense that set the basis for the sentence. *See id.* at 597–98. The court may have a disagreement with the Guidelines range because it believes that it does not represent the "heartland" of cases. *See Kimbrough*, 128 S.Ct at 574–76. Nevertheless, it must still give meaningful consideration to the sentencing goals, and, in particular, the command to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in subsection (a)(2)—the so-called parsimony provision. *Id.* at 570–71; *see also Spears*, 129 S.Ct. at 842–43. We also note that § 3553(a)(5) discusses "any pertinent policy statement [that is] issued by the Sentencing Commission." The Commission's criticism of the disparity created by fast-track programs could be considered by a district court under this factor as well. And in sentencing a defendant below the Guidelines range, it would not be unreasonable for a court to take into account the lower, departure-based fast-track range and use it as a barometer in crafting the appropriate sentence. *See Spears*, 129 S.Ct. at 842–43.

Finally, we address the argument that affording district courts discretion on this issue will create even more *ad hoc* sen-

example describes three defendants traveling together from Mexico to work in Nebraska. They cross through Western Texas where one worker is arrested for illegal reentry. This is a fast-track district, and he is given a one-level departure. His friend is similarly arrested in Oklahoma, a non-fast-track district, and given no departure, which results in a Guidelines range almost two years higher than the first defendant. The final defendant is picked up in Nebraska, a fast-track district, and gets a more significant departure, which results in the lowest Guidelines range. Moreover, we can also imagine a scenario where a defendant lives with his family in a fast-track district (*e.g.*, Northern California) but works in a different, non-fast-track district (*e.g.*, Nevada), and is prosecuted, to his detriment, for illegal reentry in the district were he works (or vice versa).

tencing disparity in the system. We are not convinced that this discretion would result in further disparity. In any event, we disagree that the possibly greater disparity perceived would justify proscribing the discretionary authority of a sentencing judge. As *Kimbrough* explained, "[t]o reach an appropriate sentence, these disparities must be weighed against the other § 3553(a) factors and any unwarranted disparity created by the crack/powder ratio itself," or in this case the uneven implementation of fast-track programs in certain jurisdictions that create disparate sentences for similarly culpable defendants. *Id.* Moreover, a district court is not afforded unfettered discretion in sentencing defendants. It is constrained by our procedural and substantive reasonableness review, and a variant sentence that is based solely on a fast-track disparity, particularly if it is below the four-level departure authorized by Congress in fast-track districts, might be unreasonable in our view.

### 3. Variance in an Individual Case

While we have concluded that a district court can consider a variance on the basis of a fast-track argument, under what circumstances would such a variance be deemed reasonable? A generalized argument to a district court that a defendant should be sentenced below the Guidelines range because of fast-track disparity is alone not sufficient to justify such a variance.[12] This type of argument does not enable a court to consider the validity of fast-track disparities as applied to an individual defendant and impose a sentence in a tailored manner under the sentencing factors. *See Gall,* 128 S.Ct. at 597. However, a defendant is not required to show that he is exactly similarly situated to a particular fast-track defendant in another district.

To justify a reasonable variance by the district court, a defendant must show at the outset that he would qualify for fast-track disposition in a fast-track district. For example, a defendant's serious criminal history may disqualify him in most fast-track districts. This type of showing would also be an instrumental factor for a district court in determining under § 3553(a) whether a Guidelines range sentence is greater than necessary to meet the sentencing objectives. The Government, obviously, would be free to contend to the contrary—that the defendant would not qualify in a fast-track district or that the adjusted range would be different than that suggested by the defendant.

In this case, Arrelucea stated in his sentencing brief that he qualified for a departure in fast-track districts, and that if he "were to receive a 4–level reduction . . . his [G]uideline[s] sentencing range would be 30 to 37 months," instead of his 46 to 57 month non-fast-track range. Overall, based on the totality of the § 3553(a) factors and Arrelucea's circumstances, he argued that a sentence between two and three years would be appropriate. The Government responded that Arrelucea did not show that he is "similarly situated to other defendants found guilty of similar conduct."[13]

**12.** In this way, the fast-track issue differs from the crack cocaine analysis in *Kimbrough*. The fast-track disparity applies to a segment of immigration defendants that are unfortuitously prosecuted in non-fast-track districts (but would have qualified for fast-track treatment), whereas the crack/powder cocaine disparity applies to crack defendants across-the-board.

**13.** The requirement we outlined above, however, is not one of exacting particularity. We do not contemplate that a defendant must seek out and match himself with a specific defendant in a fast-track jurisdiction that has

Additionally, a defendant must demonstrate that he would have taken the fast-track guilty plea if offered (and, in so doing, waived his appellate rights, including his habeas rights but for ineffective assistance of counsel). For example, in Arrelucea's case the sentencing record shows that he would have accepted a fast-track plea if the Government had offered him one. He offered to accept a plea agreement and waive his appellate (and, we presume, his habeas) rights if the Government would stipulate to a four-level departure at sentencing. The Government, of course, rejected this offer. Moreover, at the sentencing hearing defense counsel informed the District Court that Arrelucea would have accepted a fast-track plea. We do not require a more extensive showing. Requiring anything more than what Arrelucea did in this case would create an insurmountable obstacle for a defendant because the point in affording a sentencing judge discretion to consider the disparity created between fast-track and non-fast-track districts as part of the compendium of § 3553(a) sentencing factors is that this type of plea is not available to a defendant in a non-fast-track district. As

is conventional sentencing practice, the Government would be free to argue that a variance below the Guidelines range on the basis of fast-track disparity would not comport with the § 3553(a) factors.

## IV. Conclusion

At the sentencing hearing, the District Court concluded that it was prohibited by *Vargas* from considering Arrelucea's fast-track disparity argument. This is no longer true in light of *Kimbrough* (as confirmed by *Spears*), and thus a district court is not barred from considering a fast-track argument when evaluating the applicable § 3553(a) factors, including the Guidelines range, at the third step of sentencing (setting the sentence). Accordingly, we vacate Arrelucea's sentence and remand to the District Court for reconsideration.[14]

exactly similar circumstances. Such a tall requirement would be overly burdensome on the defendant and unnecessary in light of *Kimbrough*'s holding. To illustrate, a defendant would not have the resources to comb through individual sentences in fast-track districts and pin down another defendant with circumstances paralleling his own. Moreover, a non-fast-track defendant would not have exactly parallel circumstances because he would not have had the opportunity to waive his appellate or other rights in exchange for the departure recommendation, as is part of a plea agreement in fast-track districts (and not available to a defendant in a non-fast-track district). *See Rodriguez*, 527 F.3d at 230–31.

**14.** Arrelucea raises two other arguments as part of his appeal. First, he claims that his sentence was procedurally unreasonable because the District Court did not give meaning-

ful consideration to the applicable § 3553(a) factors. We quickly dispose of this argument because we are vacating Arrelucea's sentence and the District Court will have another opportunity on remand to consider the parties' arguments, the sentencing factors, and impose an appropriate sentence.

Second, Arrelucea argues that the "felony" and "aggravated felony" provisions of the illegal reentry statute, 8 U.S.C. § 1326(b)(1) and (2), are unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). He raised this argument before the District Court, so waiver is not an issue here. However, it is foreclosed by the Supreme Court's decision on this issue in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), as Arrelucea recognizes. Although several Supreme Court decisions have cast doubt on the statute's continuing constitution-

al viability post-*Apprendi,* and the Court may ultimately sever certain provisions of the statute, we are bound by *Almendarez–Torres* and Arrelucea raises the issue only to preserve it. *See Shepard v. United States,* 544 U.S. 13, 27–28, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring in part) ("[A] majority of the Court now recognizes that *Almendarez–Torres* was wrongly decided."); *see also Vargas,* 477 F.3d at 104–05 (discussing that recent decisions have questioned the validity of *Almendarez–Torres).*